ORAL ARGUMENT SCHEDULED FOR OCTOBER 28, 2022
No. 22-7082

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

BROIDY CAPITAL MANAGEMENT, LLC AND ELLIOT BROIDY,

*Plaintiffs - Appellees*

v.

NICOLAS D. MUZIN, JOSEPH ALLAHAM, GREGORY HOWARD, AND
STONINGTON STRATEGIES LLC,

*Defendants - Appellees*

STATE OF QATAR

*Appellant*

Appeal from the United States District Court for the District of Columbia
Case No. 1:19-cv-0150 (DLF)

**BRIEF FOR APPELLANT STATE OF QATAR**

Mitchell A. Kamin
COVINGTON & BURLING LLP
1999 Avenue of the Stars,
Suite 3500
Los Angeles, California 90067
(424) 332-4800
mkamin@cov.com

David M. Zionts
 *Counsel of Record*
Alexander A. Berengaut
Amber M. Charles
COVINGTON & BURLING LLP
One CityCenter
850 Tenth St., N.W.
Washington, DC 20001-4956
(202) 662-6000
dzionts@cov.com
aberengaut@cov.com
acharles@cov.com

Dated: August 12, 2022                *Counsel for Appellant State of Qatar*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Appellant State of Qatar hereby submits this certificate as to parties, rulings, and related cases.  A disclosure statement per Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1 is not required.

## A. Parties and Amici

Appellant is the State of Qatar.  Plaintiffs-Appellees are Broidy Capital Management, LLC and Elliott Broidy.  Defendants-Appellees are Nicolas D. Muzin, Joseph Allaham, Gregory Howard, and Stonington Strategies LLC.  The United States has entered an appearance following this Court's order inviting the Department of Justice to file an amicus curiae brief expressing the views of the United States.  There are no additional parties or amici.

## B. Rulings Under Review

The ruling under review in this proceeding is the portion of Judge Dabney L. Friedrich's June 2, 2022 Order, JA287, and accompanying Memorandum Opinion of the same date, JA288, granting Plaintiffs-Appellees' Motion to Compel Defendants to Answer Discovery Requests, in Case No. 19-cv-150.  The Order and Memorandum Opinion are unpublished, but the Memorandum Opinion is available at 2022 WL 1801031.

## C. Related Cases

This case was previously before this Court, as *Broidy Capital Management LLC v. Muzin*, No. 20-7040, in which this Court concluded that Defendants were not entitled to derivative sovereign immunity in their capacity as contractors for Qatar.

*Mosafer, Inc. v. Broidy*, Nos. 22-55265, 22-55296 (9th Cir.), is a related case currently before the Ninth Circuit. In the underlying district court litigation in that matter, Broidy Capital Management, LLC and Elliott Broidy filed a counterclaim against the State of Qatar asserting that Qatar is responsible for the alleged hacking of their computer systems and dissemination of their private materials. The district court dismissed the counterclaim on sovereign immunity grounds.

# **TABLE OF CONTENTS**

INTRODUCTION ........................................................................... 1

JURISDICTIONAL STATEMENT .................................................. 4

STATEMENT OF THE ISSUES ...................................................... 4

RELEVANT TREATIES ................................................................. 4

STATEMENT OF THE CASE ......................................................... 5

    A.    The Vienna Conventions ...................................................... 5

    B.    Qatar Faces Foreign Policy Challenges Arising from Hostile Acts by Neighboring Countries ............................................ 7

    C.    Elliott Broidy's Litigation Against Qatar and Its Former Contractors ......................................................................... 8

    D.    Qatar Seeks to Protect Sensitive Governmental Materials from Discovery ..................................................................... 10

    E.    The District Court Categorically Rejects Qatar's Privileges and Immunities .................................................................. 12

    F.    Qatar's Appeal and This Court's Stay ................................ 14

STANDARD OF REVIEW ........................................................... 15

SUMMARY OF ARGUMENT ...................................................... 15

ARGUMENT ............................................................................... 18

I.    This Court Has Jurisdiction Over Qatar's Appeal ....................... 18

    A.    Qatar Has the Right to Appeal a Discovery Order That Rejects Qatar's Own Privileges and Immunities. ............................ 19

    B.    The Discovery Order Is Appealable. ................................... 22

        1.    The Collateral Order Doctrine Applies. ...................... 22

        2.    The *Perlman* Doctrine Applies. ................................. 27

C.    In the Alternative, This Court Should Construe Qatar's Notice of Appeal as a Mandamus Petition ....................................................... 28

II.    The District Court Improperly Denied Qatar an Opportunity to Make Document-by-Document Assertions of Privilege and Immunity ................. 29

III.   The District Court Misinterpreted the Vienna Conventions. ........................ 32

A.    Materials Held by a Diplomatic Mission's Contractors May Be Inviolable as "Archives And Documents of the Mission" Under Article 24. ............................................................................................... 34

B.    Article 27 Encompasses Official Correspondence "of the Mission" Held by Non-Mission Parties. ................................ 52

IV.   The District Court Misunderstood International Comity Principles. ........... 53

A.    International Comity Protects Sensitive, Non-Public Materials and Information of a Foreign Sovereign from Disclosure, Irrespective of the Target of Discovery. ............................................ 55

B.    The District Court Erred in Holding the Deliberative Process Privilege Categorically Inapplicable to Materials Held by Private Parties. ...................................................................................... 58

CONCLUSION ..................................................................................................... 61

ADDENDUM

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abbott v. Abbott*,
    560 U.S. 1 (2010)..........................................................................33, 43

*Air France v. Saks*,
    470 U.S. 392 (1985).............................................................................33

*Allen v. District of Columbia*,
    969 F.3d 397 (D.C. Cir. 2020)...........................................................14

*Att'y Gen. of U.S. v. Covington & Burling*,
    411 F. Supp. 371 (D.D.C. 1976).........................................................51

*Aurelius Cap. Master, Ltd. v. Republic of Argentina*,
    589 F. App'x 16 (2d Cir. 2014) (summary order)......................25, 27

*Boos v. Barry*,
    485 U.S. 312 (1988).............................................................................24

*Breard v. Greene*,
    523 U.S. 371 (1998).............................................................................51

*Broidy Cap. Mgmt. LLC v. Muzin*,
    12 F.4th 789 (D.C. Cir. 2021).............................................................10

*Broidy Cap. Mgmt., LLC v. Qatar*,
    982 F.3d 582 (9th Cir. 2020), *cert. denied*, 141 S.Ct. 2704 (2021) ....................9

*Broidy Cap. Mgmt., LLC v. Qatar*,
    No. 18-2421 (C.D. Cal. Apr. 4, 2018), 2018 WL 2558459.................9

*Burka v. U.S. Dep't of Health & Hum. Servs.*,
    87 F.3d 508 (D.C. Cir. 1996).......................................................39, 40

*Carpenter v. United States*,
    138 S.Ct. 2206 (2018).........................................................................39

*Chamber of Commerce v. E.P.A.*,
    642 F.3d 192 (D.C. Cir. 2011) ...................................................................19

*Devlin v. Scardelletti*,
    536 U.S. 1 (2002) .......................................................................................19

*Doyle v. U.S. Dep't of Homeland Sec.*,
    331 F. Supp. 3d 27 (S.D.N.Y. 2018), *aff'd*, 959 F.3d 72
    (2d Cir. 2020) .............................................................................................39

*Eastern Airlines, Inc. v. Floyd*,
    499 U.S. 530 (1991) ...................................................................................48

*EM Ltd. v. Republic of Argentina*,
    695 F.3d 201 (2d Cir. 2012) ......................................................................55

*Eur. Cmty. v. RJR Nabisco, Inc.*,
    150 F. Supp. 2d 456 (E.D.N.Y. 2001) .......................................................26

*First Eastern Corp. v. Mainwaring*,
    21 F.3d 465 (D.C. Cir. 1994) .....................................................................59

*Gonzalez Ramos v. ADR Vantage, Inc.*,
    2020 WL 409283 (D.D.C. Jan. 26, 2020) ..................................................60

*In re Grand Jury Investigation of Ocean Transp.*,
    604 F.2d 672 (D.C. Cir. 1979) ...................................................................28

*In re Grand Jury Subpoena Dated August 9, 2000*,
    218 F. Supp. 2d 544 (S.D.N.Y. 2002) .......................................................58

*Heffernan v. Azar*,
    417 F. Supp. 3d 1 (D.D.C. 2019) ...............................................................41

*Jud. Watch, Inc. v. U.S. Dep't of State*,
    306 F. Supp. 3d 97 (D.D.C. 2018) .............................................................60

*Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas*
    *Bumi Negara*,
    313 F.3d 70 (2d Cir. 2002) .........................................................................19

vi

*Karnoski v. Trump*,
 926 F.3d 1180 (9th Cir. 2019) ..........................................................29

*Lozano v. Alvarez*,
 697 F.3d 41 (2d Cir. 2012) ...............................................................48

*McKesson Corp. v. Islamic Republic of Iran*,
 539 F.3d 485 (D.C. Cir. 2008) ..........................................................15

*McKinley v. Bd. of Governors of Fed. Rsrv. Sys.*,
 647 F.3d 331 (D.C. Cir. 2011) ..........................................................60

*Medellín v. Texas*,
 552 U.S. 491 (2008) ..........................................................................33

*Mich. Cmty. Servs., Inc. v. NLRB*,
 309 F.3d 348 (6th Cir. 2002) ............................................................54

*Mohawk Indus., Inc. v. Carpenter*
 558 U.S. 100 (2009) ...............................................................23, 25, 27, 28

*Nat'l Inst. of Mil. Just. v. U.S. Dep't of Def.*,
 512 F.3d 677 (D.C. Cir. 2008) ..........................................40, 41, 59

*Nat'l Treasury Emps. Union v. Chertoff*,
 452 F.3d 839 (D.C. Cir. 2006) ..........................................................36

*Pac. Gas & Elec. Co. v. United States*,
 73 Fed. Cl. 333 (2006), *aff'd in part, rev'd in part and remanded
 on other grounds*, 536 F.3d 1282 (Fed. Cir. 2008)..........................38

*In re Papandreou*,
 139 F.3d 247 (D.C. Cir. 1998)..................................................24, 29

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
 2010 WL 3420517 (E.D.N.Y. Aug. 27, 2010) .................................57

*Perlman v. United States*,
 247 U.S. 7 (1918)........................................................................27, 28

*Process & Indus. Devs. Ltd. v. Fed. Republic of Nigeria*,
    962 F.3d 576 (D.C. Cir. 2020) ....................................................26

*Pub. Emps. for Env't Resp. v. U.S. Section, Int'l Boundary & Water*
    *Comm'n, U.S.-Mexico*,
    740 F.3d 195 (D.C. Cir. 2014) ..................................................60

*Republic of Argentina v. NML Cap., Ltd.*,
    573 U.S. 134 (2014) .............................................................55, 56

*In re Rubber Chems. Antitrust Litig.*,
    486 F. Supp. 2d 1078 (N.D. Cal. 2007) ....................................57

*Sanchez-Llamas v. Oregon*,
    548 U.S. 331 (2006) ...................................................................33

*In re Sealed Case*,
    121 F.3d 729 (D.C. Cir. 1997) ..................................................59

*In re Sealed Case (Med. Recs.)*,
    381 F.3d 1205 (D.C. Cir. 2004) ...............................15, 18, 19, 20, 27

*Société Nationale Industrielle Aérospatiale v. U.S. Dist. Ct. for S.*
    *Dist. of Iowa*,
    482 U.S. 522 (1987) ...............................................26, 29, 33, 54, 55

*Soucie v. David*,
    448 F.2d 1067 (D.C. Cir. 1971) ................................................46

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009) ...................................................................19

*In re Terrorist Attacks on September 11, 2001*,
    2019 WL 3296959 (S.D.N.Y. July 22, 2019) ...........................31

*Ukiah Adventist Hosp. v. F.T.C*,
    981 F.2d 543 (D.C. Cir. 1992) ..................................................28

*United States v. Am. Tel. & Tel. Co.*,
    642 F.2d 1285 (D.C. Cir. 1980) ................................................27

*In re Upstream Addicks & Barker (Texas) Flood-Control Reservoirs,*
  52 Fed. Cl. 114 (2021) ........................................................................59

*Will v. Hallock,*
  546 U.S. 345 (2006) ....................................................................22, 23

*ZF Auto. U.S., Inc. v. Luxshare, Ltd.,*
  142 S.Ct. 2078 (2022) ........................................................................54

*Zicherman v. Korean Air Lines Co.,*
  516 U.S. 217 (1996) ...........................................................................33

**Treaties**

Vienna Convention on Diplomatic Relations, Apr. 18, 1961, 23 U.S.T. 3227,
  500 U.N.T.S. 95 ........... 5, 6, 32, 33, 34, 35, 36, 37, 42, 43, 47, 48, 49, 51, 52, 53

Vienna Convention on Consular Relations, Apr. 24, 1963,
  21 U.S.T. 77, 596 U.N.T.S. 261 ......................................................5, 6

**Statutes and Regulations**

22 U.S.C. §612 .............................................................................................50

22 U.S.C. §615 .............................................................................................50

28 U.S.C. §1331 .............................................................................................3

28 U.S.C. §1367 .............................................................................................3

28 U.S.C. §1604 ...........................................................................................21

28 U.S.C. §1605 ...........................................................................................21

28 U.S.C. §1607 ...........................................................................................21

36 C.F.R. §1222.32 .......................................................................................38

**Other Authorities**

Acquisition Regulation: Access to and Ownership of Records,
  79 Fed. Reg. 56279 (Sept. 19, 2014) ...............................................38

American Heritage Dictionary (5th ed. 2022) ..........................................37

Eileen Denza, *Diplomatic Law: Commentary on the Vienna
    Convention on Diplomatic Relations* (4th ed. 2016) ...................24, 36

Letter from Paul V. Kelly, Assistant Secretary, Legislative Affairs,
    U.S. Dep't of State, to Dan Burton, Chairman, House Comm. on
    Gov't Reform (Dec. 4, 2002), in *Hearings Before the House
    Committee on Government Reform*, 107th Congress, 2d Sess.,
    Serial No. 107-83 ................................................................................35

Oxford English Dictionary (June 2022 update).................................37, 38

*Report of the Attorney General to the Congress of the United States
    on the Administration of the Foreign Agents Registration Act of
    1938* (Dec. 2020) ...............................................................................45

Statement of William Howard Taft IV, Legal Adviser, U.S. Dep't of
    State (Dec. 11, 2002), in *Hearings Before the House
    Committee on Government Reform*, 107th Congress, 2d Sess.,
    Serial No. 107-83 ....................................................31, 43, 45, 49, 51

United Nations Conference on Diplomatic Intercourse and
    Immunities, *Official Records, Vol. I*,
    U.N. Doc. A/Conf.20/14 (1962) ...................................................6, 47

U.S. Dep't of Justice, *Recent FARA Cases* (updated June 22, 2022),
    https://www.justice.gov/nsd-fara/recent-cases ....................................9

U.S. Dep't of State, Joint Statement of the Inaugural United States-
    Qatar Strategic Dialogue (Jan. 30, 2018)..............................................7

15A Wright & Miller, *Federal Practice and Procedure* §3902.1,
    Westlaw (2d ed.) (updated May 2022) .................................................20

*Yearbook of the International Law Commission, Vol. II*,
    [1958] 2 Y.B. Int'l L. Comm'n 10.............................................5, 6, 35

## INTRODUCTION

In 2017, the State of Qatar faced a diplomatic, trade, and travel blockade by neighboring countries in the Middle East. Confronted with this threat, Qatar, through its Embassy in the United States, did what many countries do when confronting foreign policy challenges—hire contractors to support its foreign policy objective of maintaining U.S. Government support. To effectuate these partnerships, Qatar and its contractors created and exchanged materials containing sensitive information about Qatar and its foreign policy, with those materials to be held by the contractors solely for Qatar's purposes and subject to strict rules of confidentiality.

Qatar has filed this appeal for a limited but vital purpose: to protect the confidentiality of those materials from compelled disclosure, in private civil litigation, to an individual connected with one of Qatar's geopolitical adversaries. Qatar is not a party below, but it repeatedly alerted the district court of its interest in materials held by its former contractors, Defendants here.

Specifically, Qatar maintained that certain materials are protected by the Vienna Convention on Diplomatic Relations, which guarantees the inviolability of a diplomatic mission's archives, documents, and correspondence. It further explained that principles of international comity—a reciprocity-based norm called a "Golden Rule" among nations—protect from disclosure Qatar's sensitive

governmental information, including information reflecting Qatar's deliberative process in formulating policy.

To identify these materials, Qatar proposed creating a document-by-document log identifying which specific documents it considered inviolable or privileged and why. Notwithstanding the respect U.S. courts are bound to accord foreign sovereigns, however, the district court would not allow Qatar to articulate its claimed privileges and immunities in this manner, even suggesting that Qatar could not invoke its privileges and immunities at all without waiving immunity from suit.

Without the benefit of a log or any record concerning the type of information at issue, the district court issued a sweeping order granting Plaintiffs' motion to compel Defendants to produce all of the materials in question. The court first held that the Vienna Conventions are categorically inapplicable to *any* materials "freely given" to third parties, whatever interest and control the diplomatic mission retains over those materials. JA300, JA308 (Mem. Op. on Mot. to Compel). In reaching that uncompromising interpretation, the district court defied the treaty's text— turning a guarantee of inviolability for documents "wherever they may be" into one atextually limited to "lost or stolen" documents. JA302. Second, the court categorically ruled out international comity protections for materials held by a foreign sovereign's contractor. In the district court's erroneous view, respecting

comity would amount to creating a "shield" from discovery for private litigants—even though foreign sovereigns, like the U.S. Government, can retain significant legitimate interests in the protection of materials held by third parties.

The district court's ruling contravenes the United States' treaty obligations and threatens the work of diplomatic missions more generally. Embassies around the world depend on contractors for work critical to their diplomatic functions. At times, these relationships require contractors to possess sensitive governmental information. If that information were categorically ineligible for protection from civil discovery, as the district court held, diplomatic missions would hesitate to collaborate with their contractors, undermining their diplomatic functions. And just as the United States often claims privilege over documents exchanged with or created by its own contractors domestically, foreign sovereigns like Qatar are entitled to claim privilege and immunity over documents held by mission contractors.

This Court should reverse the district court's categorical holding, remand with guidance on the proper scope of the protections at issue, and provide instructions on a process that will properly respect sovereign interests.

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction under 28 U.S.C. §§1331, 1367. Qatar filed a timely notice of appeal. JA332. This Court's jurisdiction is disputed. Qatar has standing to appeal, and the district court's order is appealable under the collateral order and *Perlman* doctrines, as explained at pages 18-28.

## STATEMENT OF THE ISSUES

1.  Whether Qatar, an affected non-party with no other means of effective review, may appeal a discovery order that conclusively denied its claimed privileges and immunities under the Vienna Conventions on Diplomatic and Consular Relations ("Vienna Conventions") and principles of international comity.

2.  Whether the inviolability of mission archives, documents, and correspondence under the Vienna Conventions is categorically inapplicable to materials in the possession of a mission's contractors.

3.  Whether principles of international comity, including the deliberative process privilege, are categorically inapplicable to materials in the possession of a foreign sovereign's contractors.

## RELEVANT TREATIES

Pertinent treaty provisions are reproduced in an Addendum.

4

## STATEMENT OF THE CASE

### A.    The Vienna Conventions

Qatar and the United States are party to the Vienna Convention on Diplomatic Relations, Apr. 18, 1961, 23 U.S.T. 3227, 500 U.N.T.S. 95, and the Vienna Convention on Consular Relations, Apr. 24, 1963, 21 U.S.T. 77, 596 U.N.T.S. 261. These Conventions establish the inviolability of diplomatic and consular archives, documents, and correspondence.   Because the relevant language in the two Conventions is materially the same, this brief focuses on the Vienna Convention on Diplomatic Relations.

Article 24 reads: "The archives and documents of the mission shall be inviolable at any time and wherever they may be."[1]   The International Law Commission, which prepared the original draft, explained that the inviolability of a mission's archives and documents applies "regardless of the premises in which they may be," representing an extension from preexisting international law.  *Yearbook of the International Law Commission, Vol. II* at 96, [1958] 2 Y.B. Int'l L. Comm'n 10.

While it had been "suggested" to the Commission that the draft article was "too sweeping," its language was further expanded during negotiations.  *Id.*   The

---

[1] Article 33 of the Vienna Convention on Consular Relations states: "The consular archives and documents shall be inviolable at all times and wherever they may be."

drafters added that archives and documents are inviolable "at any time" and "wherever they may be."  *See* United Nations Conference on Diplomatic Intercourse and Immunities, *Official Records, Vol. I* at 16, U.N. Doc. A/Conf.20/14 (1962). These additions "establish[ed] clearly the absolute inviolability of the mission's archives and documents as such," "even outside the premises of the mission."  *Id.* at 148.

Article 27 addresses freedom of diplomatic communication.  Its second paragraph reads: "The official correspondence of the mission shall be inviolable.  Official correspondence means all correspondence relating to the mission and its functions."[2]  While the original draft of Article 27 did not provide for the inviolability of a mission's official correspondence, the International Law Commission updated the provision so that "the official correspondence of the mission, whether carried in the [diplomatic] bag or not," would be "inviolable." *Yearbook of the International Law Commission, Vol. II* at 97.

---

[2] Article 35(2) of the Vienna Convention on Consular Relations states: "The official correspondence of the consular post shall be inviolable.  Official correspondence means all correspondence relating to the consular post and its functions."

**B.    Qatar Faces Foreign Policy Challenges Arising from Hostile Acts by Neighboring Countries**

Qatar is situated in a critical location on the Arabian Gulf, where it is a key U.S. ally and hosts the largest U.S. military facility in the Middle East.  In 2017, four countries, including Qatar's immediate neighbors the United Arab Emirates and Saudi Arabia, cut diplomatic, trade, and transport ties with Qatar.  Although the United States recognizes Qatar's role in "combating terrorism [and] countering violent extremism,"[3] its Gulf adversaries mounted a campaign to convince U.S. policymakers, and the U.S. public, otherwise.

Against this backdrop, Qatar's Embassy in the United States sought the assistance of outside advisers.  The Defendants in this case are political consultants, lobbyists, and public relations professionals, all registered under the Foreign Agents Registration Act.  JA28-29 ¶¶ 14-18 (First Amended Complaint).

The exact terms of Defendants' arrangements with Qatar differ somewhat. One contract provides, for example, that all deliverables generated under the contract are "the sole property of the Embassy," and that the contractor "will not use any confidential information for any purpose other than performance of this Agreement,"

---

[3] U.S. Dep't of State, Joint Statement of the Inaugural United States-Qatar Strategic Dialogue (Jan. 30, 2018), https://2017-2021.state.gov/joint-statement-of-the-inaugural-united-states-qatar-strategic-dialogue/index.html.

and "will return … [the] information upon request."[4]   Another provides that "all documents, information or communications (whether verbal or recorded) exchanged between you and the Embassy (including the Embassy's diplomats, employees, contractors, or attorneys), and any information generated or received by you in the course of your performance of this Agreement, are confidential, and will not be disclosed to any person except as instructed by the Embassy or as required by law."[5]

### C.    Elliott Broidy's Litigation Against Qatar and Its Former Contractors

In 2018, Elliott Broidy and a California company under his sole control, Broidy Capital Management, LLC (collectively, "Broidy"), sued Qatar, two of Qatar's contractors, Nicholas Muzin and Stonington Strategies LLC, and others in federal court in California.  *See Broidy Cap. Mgmt., LLC v. Qatar*, No. 18-2421 (C.D. Cal. Mar. 26, 2018), ECF No. 1.

Broidy is a self-described "outspoken critic of the State of Qatar," JA24 ¶ 1 (First Amended Complaint), and a twice-convicted felon.  Most recently, Broidy pled guilty to violating the Foreign Agents Registration Act by "secretly do[ing] the

---

[4] Information Management Services, Inc. Consulting Services Agreement, Exs. A-B to Registration Statement, at 3-5 (Oct. 30, 2017), https://efile.fara.gov/docs/6442-Exhibit-AB-20171030-2.pdf.  This agreement applied to Defendant Howard, who was a consultant to Qatar through Conover + Gould Strategic Communications, Inc., a subcontractor of Information Management Services, Inc.

[5] Stonington Strategies LLC Agreement for Consulting Services, JA225-226.

bidding of foreign principals" in "a covert campaign to influence the U.S. Government." U.S. Dep't of Justice, *Recent FARA Cases* (updated June 22, 2022), https://www.justice.gov/nsd-fara/recent-cases. At Broidy's plea hearing, federal prosecutors stated that his unlawful conduct extended to "efforts to obtain business from a Middle Eastern country and … efforts to influence U.S. policy towards a second Middle Eastern country"—comments that can only be understood as a reference to the United Arab Emirates and Qatar, respectively. *See* Arraignment and Change of Plea Tr. at 65:21-24, *United States v. Broidy*, Case No. 20-cr-210 (filed D.D.C. Oct. 23, 2020), ECF No. 13.

In the California litigation, Broidy alleged that Qatar and its co-defendants organized a cyber-espionage operation to discredit him. Qatar strongly denied Broidy's allegations, and the court, in denying Broidy's application for a temporary restraining order, concluded that Broidy had provided no "admissible evidence demonstrating that" Qatar was "responsible for the unauthorized access" of his computer systems. Order, *Broidy Cap. Mgmt., LLC v. Qatar*, No. 18-2421 (C.D. Cal. Apr. 4, 2018), 2018 WL 2558459, at *2. The district court ultimately dismissed the case against Qatar on sovereign immunity grounds, and the Ninth Circuit affirmed. *See Broidy Cap. Mgmt., LLC v. Qatar*, 982 F.3d 582 (9th Cir. 2020), *cert. denied*, 141 S.Ct. 2704 (2021).

Less than a year later, on January 24, 2019, Broidy filed this suit against Defendants Muzin, Joseph Allaham, Gregory Howard, and Stonington Strategies LLC, alleging that they participated on Qatar's behalf in disseminating allegedly hacked materials concerning Broidy. ECF No. 1.

Defendants moved to dismiss Broidy's complaint on grounds of derivative sovereign immunity, which the district court denied, and for failure to state a claim, which the court granted in part, and denied in part. *See* JA104. In affirming, this Court noted that, in the event Broidy sought "to 'gain access to Qatar's sensitive, diplomatic communications,'" it "trust[ed] the district court has the appropriate tools to protect Qatar's absolute FSIA 'immunity from trial and the attendant burdens of litigation.'" *Broidy Cap. Mgmt. LLC v. Muzin*, 12 F.4th 789, 804 (D.C. Cir. 2021) (citations omitted).

## D.      Qatar Seeks to Protect Sensitive Governmental Materials from Discovery

On remand, Qatar filed a Notice of Interest "to ensure that its sovereignty and immunities are respected in any discovery that is conducted," while preserving its sovereign immunity from suit. JA148. Broidy immediately moved to "strike" the Notice, insisting that "Qatar must move to intervene under Fed. R. Civ. P. 24 should it wish to participate as to a given discovery issue." ECF No. 69, at 3. The district court "decline[d] to strike" the Notice and stated that "Qatar may submit the

10

equivalent of amicus briefs," but that "no pending motion requires addressing Qatar's exact status in this case."  Minute Order (Dec. 8, 2021).

In the context of competing proposals for a protective order, Qatar filed a Statement of Interest endorsing Defendants' proposal that Qatar review materials from third parties for potential privilege or inviolability prior to their production. JA159.  The district court entered a protective order, but refused to permit Qatar "to review and redact documents" prior to disclosure.  ECF No. 96, at 1.

As predicted in the Notice of Interest, Broidy's initial discovery requests implicated Qatar's privileges and immunities.  Defendants objected to those requests in part on the basis that the materials sought, though in Defendants' possession, implicated Qatar's privileges.  Broidy then filed a motion to reconsider the protective order, ECF No. 102, as well as a motion to compel disclosure of all "relevant materials in [Defendants'] possession."  ECF No. 109-1, at 6.  In these motions, Broidy argued that the Vienna Conventions and principles of international comity categorically do not apply to materials in Defendants' possession.  *Id.* at 10-14.

Qatar filed a second Statement of Interest, concerning the motion to compel. In both of its Statements, Qatar explained that the discovery requests implicated the inviolability of documents, archives, and correspondence under the Vienna

Conventions, as well as principles of international comity and the deliberative process privilege.  *See* JA161; JA227.

Recognizing that these issues present novel, rarely-litigated questions of law, Qatar urged the district court not to issue broad rulings in the abstract about the applicability of the Vienna Conventions and international comity to materials held by a diplomatic mission's contractors.  Instead, Qatar proposed, again, to review potentially privileged materials before production, identify specific documents over which it asserted a privilege or immunity, and produce a log explaining those claims—potentially narrowing the scope of the dispute, and creating a meaningful record for the district court to resolve any remaining questions about the scope of Qatar's privileges and immunities.  JA227-232.

### E.    The District Court Categorically Rejects Qatar's Privileges and Immunities

On June 2, 2022, the district court granted Broidy's motion to compel discovery and his motion to reconsider the scope of the protective order.  JA287-288.[6]

Rather than accept Qatar's request for a document-by-document process, the district court held categorically that the Vienna Conventions do not protect

---

[6] That ruling lifted an "attorney's eyes only" restriction, allowing Broidy to personally review anything produced in discovery.  JA295-97.

documents "freely given to non-mission parties," and that "any documents communicated to the defendants by Qatar or its agents 'no longer belong[] to [Qatar] and hence no longer enjoy[] inviolability.'" JA300, JA306, JA308 (alterations in original) (citation omitted). The court held out the theoretical possibility that documents in Defendants' possession could be protected by the Conventions if they "belong[ed]" to Qatar, but blamed Qatar for "offer[ing] only conclusory statements that the requested documents belong to Qatar," JA300—despite having refused Qatar's requests for an opportunity to assert its privileges and immunities on a document-by-document basis.

The district court further rejected the possibility that international comity could "shield private, American parties" from discovery, JA308, or that the deliberative process privilege could ever "shield documents held by a private, non-governmental entity," JA310. The court further concluded that "even if private parties could invoke the [deliberative process] privilege in certain circumstances," the privilege would not apply to Defendants because there had been "no showing" that they assisted in "formulating [Qatar's] foreign policy." *Id.* The court also considered the deliberative process privilege "forfeited" because Defendants had not sufficiently briefed it in opposing the motion to compel, and Qatar "lacks the capacity to preserve arguments on the defendants' behalf." *Id.*

13

**F.      Qatar's Appeal and This Court's Stay**

Four days later, on June 6, 2022, Qatar appealed the portion of the order granting Broidy's motion to compel.  JA332.  After Broidy would not agree that Qatar's appeal divested the district court of jurisdiction over the matters on appeal, Qatar filed a motion to confirm divestiture of the district court's jurisdiction or, in the alternative, to stay the discovery order.  JA334.  The district court denied the motion.  JA351.

Qatar then filed an emergency motion in this Court to stay the discovery order. Doc. No. 1950964 (June 16, 2022).  Broidy cross-moved to dismiss Qatar's appeal. Doc. No. 1952065 (June 24, 2022).  On July 1, 2022, a panel of this Court granted Qatar's motion, finding that Qatar "has satisfied the stringent requirements for a stay pending appeal."  Doc. No. 1953185.  The Court referred the cross-motion to dismiss to the merits panel.  *Id.*

After Broidy moved to expedite, another motions panel entered an order, on its own motion, inviting the U.S. Department of Justice "to file an amicus curiae brief addressing the views of the United States on this case."  Doc. No. 1954969 (July 14, 2022).

## STANDARD OF REVIEW

This Court "review[s] a district court's discovery rulings for abuse of discretion." *In re Sealed Case (Med. Recs.)*, 381 F.3d 1205, 1211 (D.C. Cir. 2004) (citations omitted). "Because a district court by definition abuses its discretion when it makes an error of law, the abuse-of-discretion standard includes review to determine that the discretion was not guided by erroneous legal conclusions." *Id.* (internal quotation marks and citation omitted). The Court reviews *de novo* "question[s] of law," *Allen v. District of Columbia*, 969 F.3d 397, 402 (D.C. Cir. 2020) (citation omitted), including the "[i]nterpretation of an international treaty," *McKesson Corp. v. Islamic Republic of Iran*, 539 F.3d 485, 488 (D.C. Cir. 2008) (cleaned up).

## SUMMARY OF ARGUMENT

1.    Qatar has standing to appeal the categorical denial of its assertions of privilege and immunity over the materials in Defendants' possession because it is adversely and irreparably affected by their denial. Circuit precedent confirms that a non-party in this situation may appeal, and defeats Broidy's contention that Qatar could not appeal without intervening. The district court's discovery order is appealable on two independent grounds. It is an appealable collateral order because it conclusively denied Qatar's treaty rights and sovereign protections, that denial was

15

wholly separate from the merits, and post-disclosure review would not effectively vindicate the paramount interests at stake. It is additionally appealable under the *Perlman* doctrine because the materials at issue are held by Defendants, but the privileges and immunities belong to Qatar, raising the possibility that Defendants will turn the materials over rather than risk contempt.

2.      The district court improperly denied Qatar a meaningful opportunity to assert protection under the Vienna Conventions and international comity. The court held that Qatar lacked capacity to claim its own privileges and immunities, suggesting that it would need to waive immunity in order to do so. It further denied Qatar's request to identify and explain its privilege and immunity assertions on a document-by-document basis—and then faulted Qatar for not making specific "showings" it had denied Qatar the opportunity to make.

3.      In holding that materials "freely given" to non-mission parties categorically lose their inviolability under the Vienna Conventions, JA300, JA308, the district court ignored those Conventions' text, context, purpose, negotiating history, and past construction. Despite the Vienna Convention on Diplomatic Relations' clear command that documents and archives of the mission are inviolable *wherever they may be*, the district court adopted an atextual reading of that language as protecting only "lost or stolen" mission documents. To the contrary, the plain

meaning of the Convention—particularly when read in light of the Convention's stated purpose of assuring the efficient performance of diplomatic missions—confirms that documents held by third parties are not categorically unprotected. Materials can naturally be considered "of the mission" based on indicia such as whether the third party is engaged to assist in the performance of a diplomatic mission's functions, holds materials for the sole and limited purpose of aiding the mission in those functions, is restricted from using the materials for any other purpose, must return the materials to the mission on demand, and is subject to strict requirements of confidentiality regarding the materials.

4.    The district court further erred in categorically rejecting application of international comity principles on the basis that applying them would "shield private, American parties from discovery."  JA308.  Comity protects sovereigns, not private individuals, and as the U.S. Government has explained, disclosure of sensitive governmental information is legitimately of significant concern to a foreign state even if discovery requests are targeted at third parties.  Comity further incorporates the deliberative process privilege, which applies to materials generated in the course of formulating government policy.  The district court's categorical ruling that this privilege is inapplicable to materials held by third-party contractors is refuted by the practice of the U.S. Government and courts, which accept that exchanges between

17

federal agencies and outside consultants can be privileged deliberative process materials.

## ARGUMENT

## I.    This Court Has Jurisdiction Over Qatar's Appeal.

Since discovery in this case began, Qatar has sought to invoke protections under the Vienna Conventions and principles of international comity—privileges and immunities that belong to Qatar alone.  In the order on appeal, the district court ruled that materials in Defendants' possession are categorically unprotected from disclosure, conclusively denying Qatar's claims.  *See* JA287.  Without review, sensitive materials that a foreign sovereign asserts are inviolable and privileged will be turned over to Broidy, a private individual whose interests are avowedly adverse to Qatar's.  And if Qatar is correct on the merits, the instant these disclosures happen, the United States will be in breach of treaty obligations, and Qatar's sovereign interests will be irreparably injured.

Despite all this, Broidy has argued that Qatar lacks standing to bring this appeal because it has not formally intervened under Federal Rule of Civil Procedure 24, and that the district court's discovery order is not appealable.  *See* Doc. No. 1952065, at 19-30 (June 24, 2022).  Both arguments are meritless.  Under this Court's decision in *In re Sealed Case (Medical Records)*, 381 F.3d 1205, Qatar is

entitled to bring this appeal. And under the collateral order and *Perlman* doctrines, this Court has jurisdiction to hear it.

### A.     Qatar Has the Right to Appeal a Discovery Order That Rejects Qatar's Own Privileges and Immunities.

Article III standing requires "a personal stake in the outcome of the controversy as to warrant [a litigant's] invocation of federal-court jurisdiction." *Chamber of Commerce v. E.P.A.*, 642 F.3d 192, 199 (D.C. Cir. 2011) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)). Because Qatar holds the claimed privileges and immunities rejected by the discovery order, it possesses the requisite "personal stake" in that order. *Id.*; *see also In re Sealed Case (Med. Recs.)*, 381 F.3d at 1211 n.4 ("There certainly is no question regarding the [non-party] appellant's constitutional standing, as his privacy interest in the records creates the necessary case or controversy.").

That Qatar is not a party to this litigation does not strip it of standing to appeal. *See Devlin v. Scardelletti*, 536 U.S. 1, 6-7 (2002) ("[The] issue" of whether nonparties may appeal "does not implicate the jurisdiction of the courts under Article III of the Constitution."). To the contrary, non-parties may appeal if they are "bound by the order from which they [are] seeking to appeal," and if that order amounts to a "final decision of [the non-party's] right or claim." *Id.* at 8-9; *see also Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 313 F.3d

70, 81-82 (2d Cir. 2002) (permitting appeal by Indonesian Ministry of Finance, a "Non-Party with Interest," because it was "affected by the trial court's judgment") (quotation marks and citations omitted); 15A Wright & Miller, *Federal Practice and Procedure* §3902.1, Westlaw (2d ed.) (updated May 2022) ("[N]onparties can achieve standing to appeal," and "[a]ppeal by way of a simple notice of appeal should be available" to non-parties "directly bound or affected by an order.").

Applying these principles, this Court in *In re Sealed Case (Medical Records)* held that "a non-party may appeal orders for discovery if he has no other effective means of obtaining review." 381 F.3d at 1211 n.4 (quotation marks and citations omitted). Here, Qatar is plainly affected by the discovery order, the district court's final adjudication—and rejection—of Qatar's claims of privilege and immunity in the materials at issue.

Qatar was not required, as Broidy claims, to intervene as a condition of asserting its privileges and immunities, and appealing their denial. Again, this Court has permitted appeals by a non-party who "had not moved to intervene," where the non-party had "no other effective means of obtaining review." *Id.* (quotation marks and citations omitted). Requiring intervention would be particularly inappropriate here. Qatar was justifiably concerned that, if it intervened, Broidy would sue Qatar directly, invoking the Foreign Sovereign Immunities Act's counterclaim exception

to immunity (which applies in some circumstances where "a foreign state intervenes") or the waiver exception (which permits waivers "by implication"). *See* 28 U.S.C. §§1607, 1605(a)(1). While those exceptions would not in fact apply, Broidy is presently asserting an even more exotic reading of the counterclaim exception against Qatar in another court, *see Mosafer, Inc. v. Broidy*, Nos. 22-55265, 22-55296 (9th Cir.), and Qatar reasonably sought to avoid having to defend its immunity yet again.

All but confirming Qatar's fears of what intervention would have precipitated, Broidy has told this Court that Qatar should not be entitled to participate in this case without "subjecting itself to the jurisdiction of the District Court." Doc. No. 1952065, at 4 (June 24, 2022). The district court put things even more bluntly when it made the remarkable suggestion that it was a "complex" question "whether Qatar can appeal a discovery order and seek an active role in the discovery process *without waiving its immunity from suit*." JA358-359 (emphasis added).

That is not a complex question at all. As a sovereign, Qatar has a right to "be immune from the jurisdiction of the courts of the United States," 28 U.S.C. §1604, *and* it has a right under the Vienna Conventions to the inviolability of its diplomatic mission's archives, documents, and correspondence, *and* it has a sovereign interest in protecting its sensitive governmental information and deliberative processes. No

sovereign can be asked to risk forfeiting one sovereign right as the price of vindicating another. It thus cannot be correct that Qatar was required to risk a claim that it had surrendered its immunity from suit in order to assert its privileges and immunities in discovery. Yet that is precisely what accepting Broidy's challenge to Qatar's standing to appeal would mean.

### B.     The Discovery Order Is Appealable.

Qatar's appeal of the district court's discovery order is permissible under both the collateral order and *Perlman* doctrines.

### 1.     The Collateral Order Doctrine Applies.

An order is immediately appealable if it "(1) conclusively determine[s] the disputed question, (2) resolve[s] an important issue completely separate from the merits of the action, and (3) [is] effectively unreviewable on appeal from a final judgment." *Will v. Hallock*, 546 U.S. 345, 349 (2006) (quotation marks and citation omitted).

Broidy's motion to dismiss did not dispute that the first two requirements are met. *See* Doc. No. 1952065, at 23-26 (June 24, 2022). The discovery order "conclusively determine[d] the disputed question" of the application of the Vienna Conventions and international comity to the materials in Defendants' possession, by categorically denying their applicability. *Hallock*, 546 U.S. at 349 (quotation marks

and citation omitted). And Qatar's privileges and immunities are "completely separate from the merits of the action." *Id.*

The decision is also "effectively unreviewable" on a final judgment. *Id.* With respect to the Vienna Convention on Diplomatic Relations, Articles 24 and 27 guarantee the inviolability of a diplomatic mission's archives, documents, and correspondence. If Qatar is correct that the materials at issue are inviolable under the Convention, Qatar will thus suffer immediate harm: at the instant of disclosure, the "inviolability" of protected materials, and Qatar's treaty rights, will have been violated, and the United States will stand in breach of international law. A post-judgment appeal could not change the fact that inviolable materials were involuntarily turned over to an unauthorized individual.

In moving to dismiss, Broidy relied heavily on *Mohawk Industries, Inc. v. Carpenter*, which addressed the distinct question of "whether disclosure orders adverse to the *attorney-client privilege* qualify for immediate appeal under the collateral order doctrine." 558 U.S. 100, 103 (2009) (emphasis added). As the Supreme Court explained, the question of whether a right is "effectively unreviewable" "cannot be answered without a judgment about the value of the interests that would be lost through rigorous application of a final judgment requirement." *Id.* at 105, 107 (quotation marks and citation omitted). Applying that

23

framework, the Court concluded that "postjudgment appeals generally suffice to protect the rights of litigants and ensure the vitality of the attorney-client privilege," because "[a]ppellate courts can remedy the improper disclosure of privileged material … by vacating an adverse judgment and remanding for a new trial in which the protected material and its fruits are excluded from evidence." *Id.* at 109.

Unlike the attorney-client privilege—which, despite its importance, is a *privilege*, subject to exceptions—inviolability under the Vienna Conventions is a particularly robust form of *immunity*, an absolute shield from disclosure. *See* Eileen Denza, *Diplomatic Law: Commentary on the Vienna Convention on Diplomatic Relations* 110 (4th ed. 2016) (explaining that "[i]nviolability … is a status accorded to premises, persons, or property physically present in the territory of a sovereign State but not subject to its jurisdiction in the ordinary way," and is more absolute than some "specified immunities which fall short of inviolability"); *cf. In re Papandreou*, 139 F.3d 247, 251 (D.C. Cir. 1998) ("[W]here a litigant refuses to obey a discovery order, appeals a contempt order, and wins, the privilege survives unscathed.  For an immunity, this is not good enough.").  Moreover, the common law attorney-client privilege is not on the same order of importance as a treaty right. *Cf. Boos v. Barry*, 485 U.S. 312, 322-23 (1988) ("The Vienna Convention on Diplomatic Relations … represents the current state of international law … [and] it

24

is of course correct that the United States has a vital national interest in complying with international law.").

*Mohawk* further stressed the need to balance the "benefits" of allowing immediate appeals with the "institutional costs." 558 U.S. at 112. With respect to the attorney-client privilege, the benefits of immediate appeal were "limited," in part because "[m]ost district court rulings on these matters involve the routine application of settled legal principles" and so "are unlikely to be reversed on appeal." *Id.* at 110, 112. And the "likely institutional costs" were great, as "many" litigants would pursue such appeals and "needlessly burden the Courts of Appeals." *Id.* at 112-13. Questions of the interpretation of the Vienna Conventions are far from settled and rarely arise. Those considerations, weighed with the preeminent importance of ensuring U.S. compliance with its treaty obligations, establish that the benefits of immediate review far outweigh the limited institutional costs.

Unsurprisingly, the only other Circuit to address this question held—after *Mohawk*—that a discovery order denying a claim of immunity under the Vienna Conventions is an appealable collateral order. *See Aurelius Cap. Master, Ltd. v. Republic of Argentina*, 589 F. App'x 16, 16-17 (2d Cir. 2014) (summary order). That result accords with the treatment of sovereign immunity denials, which are immediately appealable because immunity creates a "shield from trial," which if

25

"wrongly denied at the outset of a case, … cannot be vindicated after final judgment." *Process & Indus. Devs. Ltd. v. Fed. Republic of Nigeria*, 962 F.3d 576, 581 (D.C. Cir. 2020) (quotation marks and citation omitted). Much as sovereign immunity is an absolute shield from trial, Vienna Convention inviolability is an absolute shield from disclosure.

For similar reasons, a categorical rejection of international comity protections is effectively unreviewable on appeal. The interests involved are of paramount importance, reflecting "the spirit of cooperation in which a domestic tribunal approaches the resolution of cases touching the laws and interests of other sovereign states." *Société Nationale Industrielle Aérospatiale v. U.S. Dist. Ct. for S. Dist. of Iowa*, 482 U.S. 522, 543 n.27 (1987). Furthermore, since international comity is concerned with foreign relations consequences that are the principal province of the political branches, an improper rejection of comity principles raises separation of powers concerns. *See Eur. Cmty. v. RJR Nabisco, Inc.*, 150 F.Supp. 2d 456, 474 (E.D.N.Y. 2001) ("[S]eparation of powers concerns inform application of the doctrine of international comity.").

This case illustrates the perils of non-reviewability for the denial of international comity protections. If sensitive materials relating to Qatari foreign policy are erroneously turned over to a private civil litigant with close ties to Qatar's

26

geopolitical rivals, the resulting harm will be significant, instantaneous, and irreversible.  An appeal from final judgment might result in "a new trial in which the protected material and its fruits are excluded from evidence," *Mohawk*, 558 U.S. at 109, but it would not change the fact of sensitive governmental materials being placed in unauthorized hands.  In any event, since appellate jurisdiction over the Vienna Convention issue is straightforward, this Court can also exercise "pendent appellate jurisdiction" over international comity without reaching the application of the collateral-order doctrine.  *See Aurelius*, 589 F. App'x at *17.

## 2.    The *Perlman* Doctrine Applies.

The discovery order is independently appealable under the *Perlman* doctrine.  *See Perlman v. United States*, 247 U.S. 7, 13 (1918).  *Perlman* permits immediate appeal of an otherwise non-appealable discovery order where "one party seeks documents in the hands of another and a nonparty claims to possess a privilege in the documents."  *In re Sealed Case (Med. Recs.)*, 381 F.3d at 1210 (citation omitted).  That is the situation here.  Defendants are in possession of the materials, but the privileges and immunities belong to Qatar.  Defendants may therefore "destroy [Qatar's] privilege" by "yield[ing] up the documents rather than face the hazards of contempt."  *Id.* at 1210 n.3 (quotation marks and citation omitted); *see also United States v. Am. Tel. & Tel. Co.*, 642 F.2d 1285, 1296 (D.C. Cir. 1980) (discovery order

27

appealable where non-party could "not possibly refuse disclosure and undergo a contempt citation as a means to appeal") (citations omitted); *cf. Mohawk*, 558 U.S. at 112 (noting that "appeals from contempt citations" can "facilitate immediate review of some of the more consequential attorney-client privilege rulings").

Though Defendants opposed Broidy's motion to compel rather than *voluntarily* disclose materials that Qatar may view as inviolable or privileged, that is a far cry from a willingness to face the hazards of contempt on Qatar's behalf. Qatar has no legal basis to direct Defendants to stand in contempt, and Defendants have provided no indication that they would do so.  *See In re Grand Jury Investigation of Ocean Transp.*, 604 F.2d 672, 673 & n.1 (D.C. Cir. 1979) (permitting *Perlman* appeal where document custodian "was represented by his own counsel" and "appears to have been unwilling to risk a contempt citation for [Appellant's] benefit").  Because Qatar is "powerless to avert the mischief of the [discovery] order," *Perlman*, 247 U.S. at 13, the order is immediately appealable.

### C.    In the Alternative, This Court Should Construe Qatar's Notice of Appeal as a Mandamus Petition.

Alternatively, the Court can properly construe Qatar's notice of appeal as a petition for a writ of mandamus.  *See, e.g.*, *Ukiah Adventist Hosp. v. F.T.C*, 981 F.2d 543, 548 n.6 (D.C. Cir. 1992) ("treat[ing] the appeal in this case as a petition for mandamus, as other circuits have done in similar circumstances," where appellant

"requested that the notice of appeal be considered as a petition for a writ of mandamus") (internal quotation marks and citation omitted). The circumstances presented here—sweeping, categorical denials of governmental privileges based on an erroneous legal framework and a refusal to even allow a sovereign to assert its own privileges and immunities—would merit mandamus relief. *See, e.g.*, *In re Papandreou*, 139 F.3d at 256 (granting mandamus on order compelling deposition of foreign government ministers); *Karnoski v. Trump*, 926 F.3d 1180, 1207 (9th Cir. 2019) (granting mandamus where district court, *inter alia*, failed to properly apply the deliberative process privilege).

## II. The District Court Improperly Denied Qatar an Opportunity to Make Document-by-Document Assertions of Privilege and Immunity.

This appeal raises weighty questions: whether inviolability under the Vienna Conventions, and protections from discovery under principles of international comity, are categorically inapplicable to materials possessed by the contractors of a diplomatic mission. These questions are presented in the abstract—and not as applied to specific materials or categories of materials—because of a threshold mistake made by the district court. As the Supreme Court has admonished, "American courts should … take care to demonstrate due respect … for any sovereign interest expressed by a foreign state." *Aérospatiale*, 482 U.S. at 546. In

29

two important respects, however, the district court did not afford Qatar an adequate opportunity to assert its sovereign interests, with important consequences.

*First*, even though the claimed privileges and immunities belong to Qatar, the district court refused to allow Qatar to invoke them for itself. It even suggested that Qatar could not "seek an active role in the discovery process"—that is, a role in asserting its own privileges and immunities—"without waiving its immunity from suit." JA358. According to the district court, Qatar's invocation of the deliberative process privilege, *see* JA174-175 (Qatar's Statement of Interest), had been "forfeited" *by the Defendants*, because Qatar, purportedly "in this case only as an *amicus curiae*," "lacks the capacity to preserve arguments *on the defendants' behalf*," JA310 (emphasis added).

The obvious problem is that Qatar did not seek to invoke privileges or immunities on "behalf" of anyone but itself. And as explained above, *supra* 20-22, the court could not properly condition a sovereign's right to assert privileges and immunities on intervention, while threatening that intervention would "waiv[e] its immunity from suit." JA358.

*Second*, after concluding that materials possessed by a contractor are categorically unprotected, the court faulted Qatar for not having "shown cause for protecting *specific* documents in the [D]efendants' possession, on the grounds that

30

they either 'belong to Qatar' or concern the 'formulat[ion] [of] its foreign policy."
JA355 (emphasis added) (quoting JA300, JA310 (Mem. Op. on Mot. to Compel)).
Yet the district court denied Qatar the opportunity to make such a showing.

Qatar had requested a process through which it could review potentially
protected materials, identify specific materials over which it asserted immunity or
privilege, and prepare a log explaining those assertions. *See* JA229 n.2. That
proposal was consistent with how other courts have evaluated discovery protections
asserted by sovereigns. *See, e.g.*, *In re Terrorist Attacks on September 11, 2001)*,
2019 WL 3296959, at *2, 4-6 (S.D.N.Y. July 22, 2019). It is also how the State
Department has said it would wish to approach such questions. *See* JA371
(Statement of William Howard Taft IV, Legal Adviser, U.S. Dep't of State (Dec.
11, 2002), in *Hearings Before the House Committee on Government Reform*, 107th
Congress, 2d Sess., Serial No. 107-83 ("Taft Statement")) (stating that, when
addressing Vienna Convention inviolability of materials held by third parties, the
State Department would need to consider "a number of issues," including "exactly
what documents and other information may be encompassed in a demand for
production, and the relationship of the person who holds the information to the
embassy"). And through such a process, Qatar could have explained how specific
materials "belong to Qatar," JA300, or involved "formulating its foreign policy,"

31

JA310, among other factors.  It was error for the district court to demand a factual "showing" while simultaneously denying the opportunity to make one.

Because of the district court's flawed approach, the question before this Court is abstract and categorical—whether the Vienna Conventions and international comity protections can *ever* apply to materials possessed by a third-party contractor of a diplomatic mission.  The Court should answer that question in the affirmative. But in light of the district court's serious threshold errors, Qatar respectfully urges this Court to also provide sufficient guidance and parameters to ensure that Qatar's sovereign interests are accorded due respect on remand.

## III.    The District Court Misinterpreted the Vienna Conventions.

Under Articles 24 and 27 of the Vienna Convention on Diplomatic Relations, the United States agreed to respect the "inviolability" of all documents, archives, and correspondence "of the mission" of a fellow signatory country.  Because Article 24 applies to mission documents and archives "wherever they may be," and Article 27 applies to mission "correspondence," the Convention plainly contemplates that materials can be *of* the mission even if not *held by* the mission.

In the proceedings below, Qatar argued that certain materials in Defendants' possession were "of the mission," and thus protected from compelled disclosure in civil discovery.  *See* JA168-172 (Qatar's Statement of Interest).  As Qatar sought to

show, some materials were "of the mission" because they were sent to Defendants by Qatar or prepared on Qatar's behalf for purposes of assisting the mission's diplomatic functions, were under the mission's ongoing control, and were subject to strict rules of confidentiality.  The district court disagreed, ruling categorically that "documents freely given to non-mission parties fall outside the Convention's scope," and thus it is not possible for any materials held by Defendants to be covered by Articles 24 and 27.  JA300.  That was error.

"An international agreement is to be interpreted in good faith in accordance with the ordinary meaning to be given to its terms in their context and in the light of its object and purpose."  *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 347 (2006) (quoting 1 Restatement (Third) of Foreign Relations Law of the United States §325(1) (1986)).  U.S. courts "begin 'with the text of the treaty and the context in which the written words are used,'" *Aérospatiale*, 482 U.S. at 534 (quoting *Air France v. Saks*, 470 U.S. 392, 397 (1985)), and strive for an interpretation that "accords with [the treaty's] objects and purposes," *Abbott v. Abbott*, 560 U.S. 1, 9, 20-22 (2010).  A "treaty's history, the negotiations, and the practical construction adopted by the parties may also be relevant," *Aérospatiale*, 482 U.S. at 534, as "aids to its interpretation," *Medellín v. Texas*, 552 U.S. 491, 507 (2008) (quoting *Zicherman v. Korean Air Lines Co.*, 516 U.S. 217, 226 (1996)).

33

Here, the text, context, object and purpose, negotiating history, and practical construction by the parties all point to the same conclusion: materials in the possession of a mission's contractor can be "of the mission" for purposes of the Vienna Convention on Diplomatic Relations.   Relevant factors supporting a conclusion that materials are "of the mission," and thus entitled to protection under the Convention, include whether the third party (i) is engaged to assist in the performance of a diplomatic mission's functions; (ii) holds materials for the sole and limited purpose of aiding the mission in those functions; (iii) is restricted from using those materials for any other purpose; (iv) must return those materials to the mission on demand; and (v) is subject to strict requirements of confidentiality regarding those materials.

### A. Materials Held by a Diplomatic Mission's Contractors May Be Inviolable as "Archives And Documents of the Mission" Under Article 24.

Article 24 of the Vienna Convention on Diplomatic Relations provides: "The archives and documents of the mission shall be inviolable at any time and wherever they may be."  The district court's artificially narrow interpretation of Article 24 as inapplicable to any materials "freely given to non-mission parties" cannot be reconciled with accepted principles of treaty interpretation.

34

1.    _Text._  In two ways, Article 24's text confirms that its key phrase, "[t]he archives and documents of the mission," has a broad scope.  *Accord* Letter from Paul V. Kelly, Assistant Secretary, Legislative Affairs, U.S. Dep't of State, to Dan Burton, Chairman, House Comm. on Gov't Reform (Dec. 4, 2002), in *Hearings Before the House Committee on Government Reform*, 107th Congress, 2d Sess., Serial No. 107-83, at 1469 ("The protections of the Vienna Convention are written broadly.").  First, Article 24 makes clear that the location and custody of mission archives and documents is not dispositive of their inviolability.  Instead, archives and documents of the mission are inviolable "wherever they may be."  *See also Yearbook of the International Law Commission, Vol. II* at 96 (inviolability "applies to archives and documents, regardless of the premises in which they may be").  "[B]y adding the words 'wherever they may be,'" the Convention's drafters "made it clear beyond argument that archives not on the premises of the mission and not in the custody of a member of the mission are entitled to inviolability."  JA245 (Denza Commentary).  Second, Article 24 places no temporal limitations on inviolability, with archives and documents inviolable "at any time."

The district court denied the text of Article 24 its normal operation.  According to the court, the phrase "wherever they may be" is "best read to provide *only* that a mission's documents retain their inviolability even if they are lost or stolen."  JA302

35

(emphasis added).  There is no way to read such a limitation into a protection for archives and documents "wherever they may be" and "at any time."  Certainly that language indicates that inviolability persists in circumstances of loss or theft.  But it does not imply that those are the *only* circumstances.

The sole textual hook the district court identified for such a reading was Article 24's "use of the term 'inviolable,'" which the court thought "reflected" a limited "concern with the theft or seizure of diplomatic materials."   JA300.  "Inviolability," however, is a legal term of art that does not reflect such a narrow concern.  *Cf. Nat'l Treasury Emps. Union v. Chertoff*, 452 F.3d 839, 861 (D.C. Cir. 2006) (interpreting "term of art" consistent with "long history of legal usage").  Specifically, "[i]nviolability in modern international law is a status accorded to premises, persons, or property physically present in the territory of a sovereign State but not subject to its jurisdiction in the ordinary way."  Denza, *Diplomatic Law* at 110.  For that reason, "the expression 'inviolable' [in Article 24] was deliberately chosen by the International Law Commission to convey both that the receiving State must abstain from any interference through its own authorities and that it owes a duty of protection of the archives in respect of unauthorized interference by others." JA245 (Denza Commentary).  In other words, the word "inviolability" reflects the

breadth and absolute nature of Article 24's protection, not a narrow concern with theft.

The critical question, therefore, cannot be whether archives or documents are located *at* the mission, but rather whether they are "*of* the mission."  And "of the mission" cannot be interpreted to mean only materials that "are possessed by a mission," JA300, because that would read the words "wherever they may be" out of Article 24.  As a basic matter of interpretation, there must be some class of documents that are not located on mission premises but are still documents "of the mission," and there is no principled basis for limiting that class of documents to those that have been lost or stolen or those in the possession of mission staff.

The ordinary meaning of the word "of" strengthens this conclusion.  A document may be "of" someone or something if it originates there. *See, e.g.*, *"Of,"* Am. Heritage Dictionary ("Am. Heritage") (5th ed. 2022) ("1. Derived or coming from; originating at or from"); *"Of,"* Oxford Eng. Dict. (June 2022 update) ("III. Indicating the thing, place, or person from which or whom something originates, comes, or is acquired or sought.").  Or it may be "of" someone (or something) that causes it to be created or to whom it belongs or is connected. *See, e.g.*, *"Of,"* Am. Heritage ("2. Caused by; resulting from"; "8. Belonging or

37

connected to"); *"Of,"* Oxford Eng. Dict. ("36. Belonging to a thing, as a logical consequence of its nature").

Consistent with these definitions, the phrase "of the mission" is easily read to encompass archives and documents not physically possessed by the mission, but which nevertheless originate from the mission, were caused to be created by it, or are otherwise connected to the mission.  There are a range of indicia bearing on whether a particular document qualifies as "of the mission" under these definitions, including whether materials are shared or created for the sole purpose of aiding the mission's performance of its diplomatic functions, whether their use is restricted to that purpose, whether they must be returned to the mission on demand, and whether they are required to be kept confidential.  *Cf., e.g.*, *Pac. Gas & Elec. Co. v. United States*, 73 Fed. Cl. 333, 439 (2006), *aff'd in part, rev'd in part and remanded on other grounds*, 536 F.3d 1282 (Fed. Cir. 2008) (interpreting Federal Rule of Evidence 803(8) and concluding that "[t]he qualifier 'of' [a public agency] does not mean that data compilations, records, reports and statements must in all situations have been authored by the public office or agency—just that they must have emanated therefrom") (quotation marks and citation omitted); 36 C.F.R. §1222.32 ("All data created for Government use and delivered to, or falling under the legal control of, the Government are Federal records"); Acquisition Regulation: Access to

and Ownership of Records, 79 Fed. Reg. 56279, 56280 (Sept. 19, 2014) ("Federal records" "includes records created/received by contractors that document the work specified within the contract and are generated or received during the performance of the contract"); *Burka v. U.S. Dep't of Health & Hum. Servs.*, 87 F.3d 508, 515 (D.C. Cir. 1996) (factors used to determine agency ownership of documents include "intent of the document's creator to retain or relinquish control" and "the ability of the agency to use and dispose of [documents] as it sees fit"); *Doyle v. U.S. Dep't of Homeland Sec.*, 331 F.Supp. 3d 27, 38, 51 (S.D.N.Y. 2018), *aff'd*, 959 F.3d 72 (2d Cir. 2020) (record systems, though "located at the Secret Service's headquarters" and operated by Secret Service, are "presidential records," where memorandum of understanding provides that records "shall remain under the exclusive ownership, control, and custody of the President" and Secret Service's access to records is "limited … as necessary to perform its protective functions").

Reading the phrase "of the mission" to encompass certain archives and documents in the possession of non-mission parties also accords with analogous principles of domestic law.  Justice Gorsuch has made the common-sense point that "the fact that a third party has access to or possession of *your* papers and effects does not necessarily eliminate *your* interest in them."  *Carpenter v. United States*, 138 S.Ct. 2206, 2268 (2018) (Gorsuch, J., dissenting) (emphasis added).  For instance,

"[a] bailment is the 'delivery of personal property by one person (the *bailor*) to another (the *bailee*) who holds the property for a certain purpose." *Id.* (quoting Black's Law Dictionary 169 (10th ed. 2014)). In that scenario, the owner of property lacks physical custody, yet still retains control over the property's use and disposition. In the same way, when a mission transfers archives and documents to its contractor to aid the mission's own business, and places careful limits and controls on the contractor's use of the document subject to the mission's ongoing control, that transfer does not "eliminate" the mission's "interest in" those materials in such a way as to deprive the materials of their status as being "of the mission."

Similarly, this Court has long treated certain documents in possession of a government agency's outside contractors as "agency records," even if "they were neither created by agency employees, nor are … currently located on agency property." *Burka*, 87 F.3d at 515. And it has found such documents to be agency records where contractors "acted on behalf of [the agency] in creating the [records]," and the agency "exercise[d] sufficient control over [the] documents." *Id.* Similarly, this Court has treated government agencies' confidential correspondence with outside consultants as falling within the statutory phrase "intra-agency memorandum," where the consultants are "not pursuing interests of their own" and "some indicia of a consultant relationship" exists. *Nat'l Inst. of Mil. Just. v. U.S.*

*Dep't of Def.*, 512 F.3d 677, 683-87 (D.C. Cir. 2008); *see also Heffernan v. Azar*, 417 F.Supp. 3d 1, 15 (D.D.C. 2019) (finding "indicia of consultant relationship" where agency "affirmatively solicited [consultant's] advice in aid of agency business") (cleaned up) (quoting *Nat'l Inst. of Mil. Just.*, 512 F.3d at 686).

These domestic-law examples reflect that it is natural to regard materials as being "of" a government entity even where they are not physically possessed by that entity. In apparent recognition of this reality, the district court allowed that a document could be "of" the mission if it "belongs" to the mission but is not "possessed" by it, JA303—although it denied Qatar the opportunity to show that the materials at issue "belong" to it, *see supra* 12-13. Depending on how a "belonging" standard were applied, it might be helpful to the analysis—so long as that standard is not strictly limited to formal questions of legal ownership. As a multilateral treaty joined by most countries in the world, it is unlikely that the phrase "of the mission" was intended to capture any particular legal system's strictures of ownership. Functionally, however, the factors Qatar has identified—whether materials are shared or created for the purpose of aiding the mission's diplomatic functions, whether their use is restricted to that purpose, whether they must be returned to the mission on demand, whether they are required to be kept confidential—all properly

inform whether a document "belongs" to the mission, much as they properly inform whether a document is "of" the mission.

2.    *Context.*  In reaching a contrary conclusion, the district court drew flawed inferences from the "surrounding provisions" of the Convention.  *See* JA300-301 (quoting, *inter alia*, the command in Articles 22 and 29 that "the premises of the mission" and "the person of a diplomatic agent" be held "inviolable").  According to the district court, these provisions "share a common aim of protecting diplomatic missions and their members from harassment and interference," but do not "extend protections to private citizens of what the Convention refers to as the 'receiving state.'"  JA301 (quoting art. 3(1)(a)).  From this, the district court inferred, Article 24 should also be read not to "shield non-mission parties … from civil discovery." *Id.*

The district court's conflation of *personal* inviolability with *archival* inviolability is misguided.  As the Preamble explains, the "purpose" of the Convention "is not to benefit individuals" at all, but to "ensure the efficient performance of the functions of diplomatic missions."  That objective can, and does, entail differences between personal and archival inviolability.  While the personal inviolability of non-mission parties is generally unnecessary for a mission to

function efficiently, the Vienna Conventions' drafters decided that mission archives and documents must be inviolable "*wherever they may be*."

The U.S. Government has recognized this same distinction. Mission staff who are nationals of the receiving state generally do not enjoy the Convention's protections. *See* Vienna Convention on Diplomatic Relations, art. 38(2). The United States has, however, "asserted that the official information in the possession of a local national working in the embassy is 'archival' under the Vienna Convention and thus inviolable." JA369 (Taft Statement).

The district court drew a similarly misguided inference based on Article 31, which provides that "diplomatic agent[s]" may not be compelled to "give evidence as a witness." According to the district court, since Article 31 "confers a benefit on one group expressly," others not mentioned lack that "benefit." JA301. Archival immunity, however, is a protection for the mission, not a "benefit" to any individual. By the district court's logic, Article 24 could have no application to materials or information possessed by locally employed embassy staff, as they are not protected by Article 31 from being compelled to "give evidence as a witness." As noted above, however, U.S. practice under the treaty is to the contrary. The district court was thus wrong to conclude that the protection afforded to *documents and archives* should be

43

limited based on the scope of protections afforded to the *person who may be in possession* of those documents and archives.

    3.    <u>*Object and Purpose.*</u>  Particularly since the phrase "of the mission" is general and undefined, and at least some documents outside the mission must qualify (lest the phrase "wherever they may be" become surplusage), the Court should adopt an interpretation that best "accords with [the Convention's] objects and purposes." *Abbott*, 560 U.S. at 9, 20-22.  The Convention's stated purpose is to "ensure the efficient performance of the functions of diplomatic missions as representing States."  Vienna Convention on Diplomatic Relations, Preamble ¶ 5.  That objective would be thwarted if materials entrusted to a mission's outside contractors were categorically excluded from Article 24's guarantee of inviolability.  Rather, in circumstances where a mission relies on an outside contractor to aid the performance of its diplomatic mission, shares or receives materials for that purpose, and strictly controls the contractor's use and disclosure of such materials, it best ensures the efficient performance of the diplomatic mission to respect the inviolability of such materials as "of the mission."

    Diplomatic missions frequently rely on contractors to perform essential mission functions, including for expertise relevant to foreign policy objectives.  The district court, without the benefit of any record, felt that it "strain[ed] credulity" that

the Qatari Embassy hired contractors to assist with "formulating its foreign policy." JA310.  Yet it is hardly unusual for foreign missions in the United States to do exactly that.  Diplomatic missions in this country have recently, for example, retained outside contractors to:

- "expand bilateral trade and foreign direct investment";

- conduct "outreach to U.S. Government officials" focused on "influenc[ing] [the Embassy's] interests";

- promote the country's role "as a longstanding strategic partner of the United States";

- assist with "general bilateral relations with the United States"; and

- support efforts to "deepen relations between [the state] and the U.S. government" on particular policy issues.

*Report of the Attorney General to the Congress of the United States on the Administration of the Foreign Agents Registration Act of 1938*, at 12, 50, 75, 85, 142 (Dec. 2020).  Particularly given the importance of any country's relations with the United States, it is unsurprising that many sovereigns consider it necessary to the success of their diplomatic objectives to involve outside contractors.

The United States is no exception.  U.S. missions abroad "rely[] on outside contracting," including for "embassy construction" in "sensitive posts" where contractors "work[] with information" provided to them by the State Department. JA369-370 (Taft Statement).  U.S. missions have also, for example, contracted for

45

services including "media monitoring" and "website and social media content management."[7]

In light of this diplomatic reality that is hardly unique to Qatar, "the efficient performance of the functions of diplomatic missions" will often require the exchange of mission archives and documents with outside contractors. Just as U.S. government agencies may have "a special need for the opinions and recommendations of temporary consultants, and those individuals should be able to give their judgments freely without fear of publicity," *Soucie v. David*, 448 F.2d 1067, 1078 n.44 (D.C. Cir. 1971), diplomatic missions likewise require the ability to exchange information confidentially with their contractors.

If the rule were otherwise, opportunistic civil litigants could take advantage of broad American-style discovery to probe for information about a sovereign's foreign policy. This case illustrates the point. The prospect of U.S. courts allowing Broidy, a litigant with known ties to Qatar's geopolitical rivals, to seek access to materials concerning Qatar's foreign policy, raises significant diplomatic risks. And if, as a result, diplomatic missions decide they cannot risk working with contractors due to the risk of sensitive information being disclosed, that will hinder "the efficient

---

[7] *See* Search for "Embassy AND 'public relations'" *in* Federal Procurement Data System, https://perma.cc/54K X-5ZNB.

performance of the functions of diplomatic missions as representing States." Vienna Convention on Diplomatic Relations, Preamble ¶ 5.

4.    _Negotiating History._ The Convention's negotiating history also weighs against the district court's interpretation.

In proposing an amendment to Article 24 to expand inviolability to mission archives and documents "anywhere they may be" (later modified to "wherever they may be"), delegations from Italy and France stated that their intention was "to establish clearly the absolute inviolability of the mission's archives and documents as such." United Nations Conference on Diplomatic Intercourse and Immunities, _Official Records, Vol. I_ at 148. That objective is inconsistent with the district court's view that any materials "freely given" to a non-mission party automatically lose their protections under Article 24. JA300.

Indeed, the drafters _rejected_ a proposed amendment to Article 24 that would have codified the district court's approach. Pakistan's delegate proposed amending Article 24 to "regard [archival] inviolability as void" when a document was placed in the hands of a non-mission party "with the … connivance of the mission concerned," _i.e._, by being "deposited with nationals of the receiving State." United Nations Conference on Diplomatic Intercourse and Immunities, _Official Records, Vol. I_ at 148. That amendment, however, was not accepted. Instead, immediately

after the Pakistani delegation raised its concern for a second time, the "wherever they may be" language was put to a vote, with the phrase approved by a 46-6 vote. *Id.* at 16. That the Convention's drafters rejected an amendment that would have accomplished what the district court says Article 24 already accomplishes weighs heavily against that interpretation. *See, e.g.*, *E. Airlines, Inc. v. Floyd*, 499 U.S. 530, 542-44 (1991) (rejection of proposed language informative for treaty interpretation); *Lozano v. Alvarez*, 697 F.3d 41, 53 (2d Cir. 2012) (drafting history supported interpretation where "the drafters considered and rejected an alternative proposal").

Further, the district court's reading of the "drafting history" as suggesting that "wherever they may be" refers only to "lost or stolen" materials relies on an apparent misreading of Professor Eileen Denza's commentary. JA302. Denza observed, correctly, that the inviolability of mission archives is preserved under Article 24 even "[i]f archives fall into the hands of the receiving State after being lost or stolen." JA246. Yet nowhere does her commentary suggest that *only* lost or stolen materials are entitled to Article 24 protection when located off mission premises. Nor do the negotiating records themselves contain any discussion of lost or stolen materials, much less a suggestion that such materials were the sole focus of the "wherever they may be" clause.

5.    *Construction by the Signatories.*    The district court's narrow interpretation also finds no support in how that provision has been construed by the signatories.

The United States has not previously offered a definitive interpretation of Article 24, and Qatar assumes it will provide further views in response to the Court's invitation.   In the past, however, the State Department has commented on the particular question now before this Court in ways that are incompatible with the district court's reasoning.

Contrary to the district court's holding that materials "freely given to non-mission parties" lose their inviolability, JA300, the State Department has opined that "the mere fact that archives have passed to a third party does not resolve the issue," JA371 (Taft Statement).   Contrary to the district court's conflation of individuals entitled to personal inviolability and those who might possess inviolable documents, *see supra* §III.A.2, the State Department has informed Congress that it "has in fact asserted that the official information in the possession of a local national working in the embassy" (who would lack personal inviolability) "is 'archival' under the Vienna Convention and thus inviolable," JA369.   And the Department has stated that it would "look seriously at asserting a claim of privilege, or inviolability, under the Vienna Convention," to protect sensitive information provided to "outside

49

contractors for embassy construction." JA370. Just as importantly, the State Department warned that "[t]he more information we require from embassies and their contractors, the more difficult it will clearly be for the United States to avoid reciprocal requests overseas." *Id.*[8]

Failing to heed these reciprocity concerns, the district court instead focused on the Foreign Agents Registration Act. The Act requires agents of foreign principals to register with the Attorney General, and make available for his "inspection" all "such … records" as he may prescribe. 22 U.S.C. §§612(a), 615. But contrary to the district court's view, those registration and inspection requirements do not suggest that documents in the hands of a diplomatic mission's contractors are ineligible for protection under the Vienna Conventions. As an initial matter, the civil discovery dispute in this case does not require the Court to grapple with the relationship between the Vienna Conventions and a statutory government audit provision. To the extent of any conflict between the two, the Conventions

---

[8] The State Department provided these views when asked by the House Committee on Government Reform in 2002 to opine on a dispute concerning documents in the possession of the Saudi Embassy's professional consultants. The subpoenas "were … never tested in a US court since shortly after the oral hearings described the Committee on Government Reform was reconstituted." JA248 (Denza Commentary). Contrary to the district court's suggestion, JA307-308, the vote of one congressional committee to adopt a view the State Department expressly did not endorse, concerning subpoenas that were dropped, is entitled to no weight.

would prevail as the later in time enactments. *See Breard v. Greene*, 523 U.S. 371, 376 (1998).[9]  There is no conflict, however, because the statute has long been understood to coexist with otherwise applicable privileges, a principle that naturally extends to immunities. *See Att'y Gen. of U.S. v. Covington & Burling*, 411 F. Supp. 371, 377 (D.D.C. 1976) (Foreign Agents Registration Act does not abrogate attorney-client privilege).

The district court also put considerable weight on a 1987 decision of the U.K. House of Lords interpreting Article 24. *See* JA305 (citing JA216-217 (*Shearson* case)).  As the State Department explained, the House of Lords "concluded that certain documents passed to third parties by the International Tin Council had lost their archival inviolability in the specific circumstances of that case," and "conditioned [that] decision on 'the absence of any relationship of lender and borrower, bailor and bailee or principal and agent.'"  JA371 (Taft Statement).  Thus, as the State Department concluded, *Shearson* "would not appear to reach the situation in which documents or information are given to an agent, contractor or attorney"—*i.e.*, the situation here.  *Id.*

---

[9] The Vienna Conventions on Diplomatic and Consular Relations went into force in the United States in 1972 and 1969, respectively.  The Foreign Agents Registration Act was enacted in 1938 and its pertinent implementing regulations were promulgated in 1967.

*****

In sum, all relevant principles of treaty interpretation demonstrate that the district court was wrong to categorically reject any protection for archives and documents in the hands of non-mission parties. Instead, they indicate that several factors can support a conclusion that archives and documents held by non-mission parties are "of the mission," including where a contractor holds the materials for the limited purpose of aiding the mission and where those materials are subject to strict controls concerning their use and confidentiality.

## B.    Article 27 Encompasses Official Correspondence "of the Mission" Held by Non-Mission Parties.

For similar reasons, the district court misinterpreted Article 27. Article 27 provides in relevant part: "The official correspondence of the mission shall be inviolable. Official correspondence means all correspondence relating to the mission and its functions." Thus, if correspondence is "of the mission," and relates "to the mission and its functions," it is inviolable under Article 27.

Even though "correspondence," by its very nature, is ordinarily sent to others, the district court likewise concluded that Article 27 does not apply to correspondence freely sent to non-mission parties. The district court reasoned that Article 27 "defines 'official' to mean 'relating to the mission and its functions," such that "the same meaning cannot attach to its phrase 'of the mission,' at risk of surplusage."

52

JA303.  But Qatar does not contend that any correspondence, from anyone to anyone, that "relat[es] to the mission and its functions" is correspondence "of the mission."  *Id.*  Instead, consistent with the principles outlined above, Qatar contends only that correspondence between and among a mission and its outside contractors can be "of the mission," and thus subject to inviolability, if it is, for example, held for the sole purpose of assisting in the mission's performance of its functions and is subject to confidentiality requirements.

Furthermore, as noted above, *see supra* 40-41, government agencies in the domestic context treat correspondence with their outside consultants as confidential "intra-agency" records in certain circumstances.  This established U.S. practice reinforces the conclusion that Article 27 should not be construed to categorically exclude confidential communications between a diplomatic mission and its contractors.  After all, there is little reason to believe that confidentiality is important for efficient governmental functions when the U.S. government works with contractors, but not when foreign embassies do.

## IV.    The District Court Misunderstood International Comity Principles.

The district court erred as a matter of law by holding that principles of international comity categorically cannot protect documents in the possession of private parties.  *See* JA308-309.

As an initial matter, the district court gave short shrift to comity, viewing it as a mere "related" doctrine to Vienna Convention inviolability. *Id.* Comity, however, does not turn on whether particular materials are "of the mission," or even whether a diplomatic mission (as opposed to other parts of a foreign government) is involved. Rather, comity refers to "the spirit of cooperation in which a domestic tribunal approaches the resolution of cases touching the laws and interests of other sovereign states." *Aérospatiale*, 482 U.S. at 543 n.27. It is "a golden rule among nations— that each must give the respect to the laws, policies, and interests of others that it would have others give to its own in the same or similar circumstances." *Mich. Cmty. Servs., Inc. v. NLRB*, 309 F.3d 348, 356 (6th Cir. 2002)) (quoting Black's Law Dictionary, 261-62 (7th ed. 1999)); *see ZF Auto. U.S., Inc. v. Luxshare, Ltd.*, 142 S.Ct. 2078, 2088 (2022) (comity "promotes respect for foreign governments and encourages reciprocal assistance").

Principles of international comity protect materials at issue in at least two ways. *First*, international comity protects from disclosure documents containing Qatar's sensitive, non-public information. *Second*, international comity incorporates the deliberative process privilege. The district court wrongly rejected these principles on the misplaced concern that applying them would "shield private, American parties from discovery." JA308.

**A.    International Comity Protects Sensitive, Non-Public Materials and Information of a Foreign Sovereign from Disclosure, Irrespective of the Target of Discovery.**

The Supreme Court has "long recognized the demands of comity in suits involving foreign states, either as parties or sovereigns with a coordinate interest in the litigation." *Aérospatiale*, 482 U.S. at 546.  Accordingly, while the district court found "no freestanding comity exception from the Federal Rules of Civil Procedure," JA308, the Supreme Court has instructed that international comity is an appropriate consideration when determining "the propriety of discovery requests." *Republic of Argentina v. NML Cap., Ltd*., 573 U.S. 134, 146 n.6 (2014).

As the Second Circuit recognized, when Congress decided not to "attempt to deal with questions of discovery" in the Foreign Sovereign Immunities Act, it did so because "[e]xisting law appears to be adequate in this area." *EM Ltd. v. Republic of Argentina*, 695 F.3d 201, 210 (2d Cir. 2012) (quoting H.R. Rep. No. 94-1487, at 23 (1976), 1976 U.S.C.C.A.N. 6604, 6621)).  "[I]f a private plaintiff [seeks] the production of sensitive governmental documents of a foreign state," therefore, "concepts of governmental privilege … apply." *Id.*

Nevertheless, the district court concluded that comity was categorically inapplicable because it cannot "shield private, American parties from discovery." JA308.  That is a strawman.  Qatar does not seek to protect *Defendants* from

55

discovery.  It seeks to protect materials that are in Defendants' possession, but that contain *Qatar's* sensitive, nonpublic information.

The United States, in its brief before the Supreme Court in *NML Capital*, rejected the same reasoning the district court adopted here.  The United States explained that "[t]he disclosure of potentially sensitive financial information" concerning a foreign state "is legitimately of significant concern to a foreign state *regardless of who is required to make the disclosure*."  U.S. Amicus Br., 573 U.S. 134 (2014), 2014 WL 827994, at \*32 (emphasis added).  "Third-party discovery requests concerning a foreign state's property thus implicate the same comity and reciprocity concerns that are raised by discovery sought directly from the foreign state."  *Id.* at \*32-33.  Qatar's legitimate interest in its sensitive governmental information likewise is not lessened by the question of "who is required to make the disclosure."[10]

Several courts have come to the same conclusion, declining to compel the production of materials held by private parties over which a foreign sovereign

---

[10] In *NML*, the United States expressed these views in the context of the Foreign Sovereign Immunities Act.  The Supreme Court found no protection under the Act, but recognized that "settled doctrines of privilege" and "comity" considerations applied.  *NML Cap., Ltd.*, 573 U.S. at 146 n.6 (cleaned up).  That analysis is the appropriate vehicle for addressing the comity and reciprocity concerns expressed by the Government.

asserted an interest. *See, e.g.*, *In re Rubber Chems. Antitrust Litig.*, 486 F.Supp. 2d 1078, 1081-84 & n.2 (N.D. Cal. 2007) (denying motion to compel production of European Commission documents in the hands of private parties); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2010 WL 3420517, at *10 (E.D.N.Y. Aug. 27, 2010) (same).

The district court also stated that it "would reach the same result under the balancing test that the Supreme Court endorsed in *Aerospatiale*." JA309. It is not apparent that this balancing test is appropriate when a private litigant seeks the sensitive, traditionally nonpublic information of a foreign sovereign, rather than seeking documents from another private litigant where disclosure might violate foreign law. In any event, the district court could not meaningfully balance interests after refusing Qatar the opportunity to explain the need for protecting specific documents. *See supra* 12-13; 30-32.

The district court thus erred by concluding that international comity categorically cannot protect materials in Defendants' possession from disclosure— a bright-line rule at odds with the flexible, fact-specific doctrine of comity.

57

**B.**  **The District Court Erred in Holding the Deliberative Process Privilege Categorically Inapplicable to Materials Held by Private Parties.**

The district court further erred in holding that the deliberative process privilege categorically does not apply to "documents held by a private, non-governmental entity."  JA310.

The district court wrongly found this privilege to be "forfeited" because *Defendants* "relegat[ed]" it "to a single, cursory sentence," and Qatar "lack[ed] the capacity to preserve arguments on the defendants' behalf."  *Id.*  As explained above, it was error for the district court to not allow Qatar to assert its own privilege.  *Supra* §II.

Comity is rooted in reciprocity, which "dictates that [U.S.] courts … give a foreign sovereign the same protection afforded to the executive branch of the United States."  *In re Grand Jury Subpoena Dated August 9, 2000*, 218 F.Supp. 2d 544, 553 (S.D.N.Y. 2002).  For that reason, "courts have long held that foreign governments are entitled to protect their executive deliberations," just as the U.S. Executive Branch routinely claims.  *Id.*

The privilege allows a "government to withhold documents and other materials that would reveal 'advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are

58

formulated.'"  *In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997) (citation omitted).  The privilege requires that "the material must be predecisional and it must be deliberative," and its purpose is to "allow[] government officials freedom to debate alternative approaches in private."  *Id.*

The district court did not dispute that the deliberative process privilege applies, as a matter of international comity, to foreign sovereigns.  Instead, the court held that it cannot "shield documents held by a private, non-governmental entity."  JA310.  Setting aside that comity protects sovereign interests, not private individuals, the notion that a government's deliberative processes lose protection whenever materials are sought from third parties is flatly incorrect.  *See, e.g.*, *In re Upstream Addicks & Barker (Texas) Flood-Control Reservoirs*, 52 Fed. Cl. 114, 119, 124-25, 125 n.3 (2021) (upholding United States' claim of deliberative process privilege over portions of document held by third-party entity).

As this Court has noted, the deliberative process privilege "may include materials generated at the request of an agency."  *First Eastern Corp. v. Mainwaring*, 21 F.3d 465, 468 (D.C. Cir. 1994).  That is because "[c]onsultations with temporary consultants are an integral part of an agency's deliberative process."  *Nat'l Inst. of Mil. Justice*, 512 F.3d at 678.  Thus, the U.S. Government claims, and courts entertain, deliberative process privilege claims with respect to communications

between agencies and outside consultants.  *See Gonzalez Ramos v. ADR Vantage, Inc.*, 2020 WL 409283, at *1 (D.D.C. Jan. 26, 2020) (upholding U.S. Department of Agriculture's claim of privilege over "drafts of a workplace Climate Assessment report" created by private consultant).[11]

Just as U.S. agencies communicate confidentially with their outside consultants when developing policy, so do foreign sovereigns.  And just as courts respect deliberative process privilege claims by the U.S. Executive when discovery implicates documents exchanged with and generated by private parties, so should the district court have respected Qatar's privilege claim.

As noted above, *supra* 12-13, the district court held out the possibility that Defendants might have been able to "invoke the [deliberative process] privilege" if they had assisted Qatar "in formulating its foreign policy"—while denying Qatar an opportunity to "ma[k]e [that] showing."  JA310.  The district court's flawed analysis is not saved by an illusory suggestion that Qatar could have availed itself of the privilege had it made a showing the court denied it the opportunity to make.

---

[11] *See also McKinley v. Bd. of Governors of Fed. Rsrv. Sys.*, 647 F.3d 331, 340 (D.C. Cir. 2011); *Pub. Emps. for Env't Resp. v. U.S. Section, Int'l Boundary & Water Comm'n, U.S.-Mexico*, 740 F.3d 195, 201 (D.C. Cir. 2014); *Jud. Watch, Inc. v. U.S. Dep't of State*, 306 F.Supp.3d 97, 114 (D.D.C. 2018).

## CONCLUSION

For the reasons stated above, the Court should reverse the portion of the district court's Order of June 2, 2022 granting Broidy's Motion to Compel.

Dated: August 12, 2022                         Respectfully submitted,

                                               */s/ David M. Zionts*

Mitchell A. Kamin                              David M. Zionts
COVINGTON & BURLING LLP                          *Counsel of Record*
1999 Avenue of the Stars, Suite                Alexander A. Berengaut
3500                                           Amber M. Charles
Los Angeles, California 90067                  COVINGTON & BURLING LLP
(424) 332-4800                                 One CityCenter
mkamin@cov.com                                 850 Tenth St., N.W.
                                               Washington, DC 20001-4956
                                               (202) 662-6000
                                               dzionts@cov.com
                                               aberengaut@cov.com
                                               acharles@cov.com

                                               *Counsel for Appellant State of Qatar*

61

## CERTIFICATE OF COMPLIANCE

This document complies with Fed. R. App. P. 32(a)(7)(B) because it contains 12,959 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Circuit Rule 32(e)(1). This document complies with the typeface and type-style requirements of Federal Rules 32(a)(5) and (a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman and 14 point font.

*/s/ David M. Zionts*
David M. Zionts

August 12, 2022

## CERTIFICATE OF SERVICE

I hereby certify that on August 12, 2022, I caused copies of the Brief of Appellant State of Qatar to be served by the Court's CM/ECF system, which will send a notice of the filing to all registered CM/ECF users.


*/s/ David M. Zionts*
David M. Zionts

August 12, 2022

**ADDENDUM**

# TABLE OF CONTENTS

**Page**

Vienna Convention on Diplomatic Relations

Preamble……………...…………………………………………...………...……..A-1

Article 1……...…………………………………………...……………..…A-2

Article 3………………………………………………...…………...…A-3

Article 22………………………………………………...……...…A-4

Article 24…………...…………………………………...……...…A-5

Article 26…………………………………………………...……...…A-6

Article 27…………...…...…………………………………………A-7

Article 29…………...……………………………………...………A-8

Article 30…………………………………...………...……A-9

Article 31……………………………...……...………...…A-10

Vienna Convention on Consular Relations

Preamble…………...…………………………………...….……...…..A-11

Article 1…………...………………………………...…...……..A-12

Article 31……………………………………...…...…...……..A-14

Article 33……………………………………...……...…A-15

Article 35……………………………………...…...……...…A-16

Article 41……………………………………...……...….…A-18

**Vienna Convention on Diplomatic Relations**
**Done at Vienna on 18 April 1961**

*The States Parties to the present Convention*,

*Recalling* that peoples of all nations from ancient times have recognized the status of diplomatic agents,

*Having in mind* the purposes and principles of the Charter of the United Nations concerning the sovereign equality of States, the maintenance of international peace and security, and the promotion of friendly relations among nations,

*Believing* that an international convention on diplomatic intercourse, privileges and immunities would contribute to the development of friendly relations among nations, irrespective of their differing constitutional and social systems,

*Realizing* that the purpose of such privileges and immunities is not to benefit individuals but to ensure the efficient performance of the functions of diplomatic missions as representing States,

*Affirming* that the rules of customary international law should continue to govern questions not expressly regulated by the provisions of the present Convention,

*Have agreed* as follows:

\*   \*   \*

A-1

*Article 1*

For the purpose of the present Convention, the following expressions shall have the meanings hereunder assigned to them:

*(a)*    The "head of the mission" is the person charged by the sending State with the duty of acting in that capacity;

*(b)*    The "members of the mission" are the head of the mission and the members of the staff of the mission;

*(c)*    The "members of the staff of the mission" are the members of the diplomatic staff, of the administrative and technical staff and of the service staff of the mission;

*(d)*    The "members of the diplomatic staff" are the members of the staff of the mission having diplomatic rank;

*(e)*    A "diplomatic agent" is the head of the mission or a member of the diplomatic staff of the mission;

*(f)*    The "members of the administrative and technical staff" are the members of the staff of the mission employed in the administrative and technical service of the mission;

*(g)*    The "members of the service staff" are the members of the staff of the mission in the domestic service of the mission;

*(h)*    A "private servant" is a person who is in the domestic service of a member of the mission and who is not an employee of the sending State;

*(i)*    The "premises of the mission" are the buildings or parts of buildings and the land ancillary thereto, irrespective of ownership, used for the purposes of the mission including the residence of the head of the mission.


\*    \*    \*

*Article 3*

1. The Functions of a diplomatic mission consist, inter alia, in:

*(a)*      Representing the sending State in the receiving State;

*(b)*      Protecting in the receiving State the interests of the sending State and of its nationals, within the limits permitted by international law;

*(c)*      Negotiating with the Government of the receiving State;

*(d)*      Ascertaining by all lawful means conditions and developments in the receiving State, and reporting thereon to the Government of the sending State;

*(e)*      Promoting friendly relations between the sending State and the receiving State, and developing their economic, cultural and scientific relations.

2. Nothing in the present Convention shall be construed as preventing the performance of consular functions by a diplomatic mission.

*   *   *

*Article 22*

1.  The premises of the mission shall be inviolable. The agents of the receiving State may not enter them, except with the consent of the head of the mission.

2. The receiving State is under a special duty to take all appropriate steps to protect the premises of the mission against any intrusion or damage and to prevent any disturbance of the peace of the mission or impairment of its dignity.

3. The premises of the mission, their furnishings and other property thereon and the means of transport of the mission shall be immune from search, requisition, attachment or execution.

\*   \*   \*

*Article 24*

The archives and documents of the mission shall be inviolable at any time and wherever they may be.


\*   \*   \*

*Article 26*

Subject to its laws and regulations concerning zones entry into which is prohibited or regulated for reasons of national security, the receiving State shall ensure to all members of the mission freedom of movement and travel in its territory.

\*   \*   \*

*Article 27*

1. The receiving State shall permit and protect free communication on the part of the mission for all official purposes. In communicating with the Government and the other missions and consulates of the sending State, wherever situated, the mission may employ all appropriate means, including diplomatic couriers and messages in code or cipher. However, the mission may install and use a wireless transmitter only with the consent of the receiving State.

2. The official correspondence of the mission shall be inviolable. Official correspondence means all correspondence relating to the mission and its functions.

3. The diplomatic bag shall not be opened or detained.

4. The packages constituting the diplomatic bag must bear visible external marks of their character and may contain only diplomatic documents or articles intended for official use.

5. The diplomatic courier, who shall be provided with an official document indicating his status and the number of packages constituting the diplomatic bag, shall be protected by the receiving State in the performance of his functions. He shall enjoy person inviolability and shall not be liable to any form of arrest or detention.

6. The sending State or the mission may designate diplomatic couriers ad hoc. In such cases the provisions of paragraph 5 of this article shall also apply, except that the immunities therein mentioned shall cease to apply when such a courier has delivered to the consignee the diplomatic bag in his charge.

7. A diplomatic bag may be entrusted to the captain of a commercial aircraft scheduled to land at an authorized port of entry. He shall be provided with an official document indicating the number of packages constituting the bag but he shall not be considered to be a diplomatic courier. The mission may send one of its members to take possession of the diplomatic bag directly and freely from the captain of the aircraft.

\*   \*   \*

*Article 29*

      The person of a diplomatic agent shall be inviolable. He shall not be liable to any form of arrest or detention. The receiving State shall treat him with due respect and shall take all appropriate steps to prevent any attack on his person, freedom or dignity.


\*   \*   \*

*Article 30*

1. The private residence of a diplomatic agent shall enjoy the same inviolability and protection as the premises of the mission.

2. His papers, correspondence and, except as provided in paragraph 3 of article 31, his property, shall likewise enjoy inviolability.

\*   \*   \*

*Article 31*

1. A diplomatic agent shall enjoy immunity from the criminal jurisdiction of the receiving State. He shall also enjoy immunity from its civil and administrative jurisdiction, except in the case of:

*(a)*    A real action relating to private immovable property situated in the territory of the receiving State, unless he holds it on behalf of the sending State for the purposes of the mission;

*(b)*    An action relating to succession in which the diplomatic agent is involved as executor, administrator, heir or legatee as a private person and not on behalf of the sending State;

*(c)*    An action relating to any professional or commercial activity exercised by the diplomatic agent in the receiving State outside his official functions.

2. A diplomatic agent is not obliged to give evidence as a witness.

3. No measures of execution may be taken in respect of a diplomatic agent except in the cases coming under subparagraphs (*a*), (*b*) and (*c*) of paragraph 1 of this article, and provided that the measures concerned can be taken without infringing the inviolability of his person or of his residence.

4. The immunity of a diplomatic agent from the jurisdiction of the receiving State does not exempt him from the jurisdiction of the sending State.


\*    \*    \*

## Vienna Convention on Consular Relations
## Done at Vienna on 24 April 1963

*The States Parties to the present Convention*,

*Recalling* that consular relations have been established between peoples since ancient times,

*Having in mind* the Purposes and Principles of the Charter of the United Nations concerning the sovereign equality of States, the maintenance of international peace and security, and the promotion of friendly relations among nations,

*Considering* that the United Nations Conference on Diplomatic Intercourse and Immunities adopted the Vienna Convention on Diplomatic Relations which was opened for signature on 18 April 1961,

*Believing* that an international convention on consular relations, privileges and immunities would also contribute to the development of friendly relations among nations, irrespective of their differing constitutional and social systems,

*Realizing* that the purpose of such privileges and immunities is not to benefit individuals but to ensure the efficient performance of functions by consular posts on behalf of their respective States,

*Affirming* that the rules of customary international law continue to govern matters not expressly regulated by the provisions of the present Convention,

*Have agreed* as follows:

\*   \*   \*

*Article 1*

*Definitions*

1. For the purposes of the present Convention, the following expressions shall have the meanings hereunder assigned to them:

*(a)*     "consular post" means any consulate-general, consulate, vice-consulate or consular agency;

*(b)*     "consular district" means the area assigned to a consular post for the exercise of consular functions;

*(c)*     "head of consular post" means the person charged with the duty of acting in that capacity;

*(d)*     "consular officer" means any person, including the head of a consular post, entrusted in that capacity with the exercise of consular functions;

*(e)*     "consular employee" means any person employed in the administrative or technical service of a consular post;

*(f)*     "member of the service staff" means any person employed in the domestic service of a consular post

*(g)*     "members of the consular post" means consular officers, consular employees and members of the service staff;

*(h)*     members of the consular staff" means consular officers, other than the head of a consular post, consular employees and members of the service staff

*(i)*     "member of the private staff" means a person who is employed exclusively in the private service of a member of the consular post;

*(j)*     "consular premises" means the buildings or parts of buildings and the land ancillary thereto, irrespective of ownership, used exclusively for the purposes of the consular post;

*(k)*     "consular archives" includes all the papers, documents, correspondence, books, films, tapes and registers of the consular post, together with the ciphers and codes, the card-indexes and any article of furniture intended for their protection or safe keeping.

2. Consular officers are of two categories, namely career consular officers and honorary consular officers. The provisions of Chapter II of the present Convention apply to consular posts headed by career consular officers, the provisions of Chapter III govern consular posts headed by honorary consular officers.

3. The particular status of members of the consular posts who are nationals or permanent residents of the receiving State is governed by article 71 of the present Convention.

\*   \*   \*

*Article 31*

*Inviolability of the consular premises*

1.  Consular premises shall be inviolable to the extent provided in this article.

2.  The authorities of the receiving State shall not enter that part of the consular premises which is used exclusively for the purpose of the work of the consular post except with the consent of the head of the consular post or of his designee or of the head of the diplomatic mission of the sending State. The consent of the head of the consular post may, however, be assumed in case of fire or other disaster requiring prompt protective action.

3.  Subject to the provisions of paragraph 2 of this article, the receiving State is under a special duty to take all appropriate steps to protect the consular premises against any intrusion or damage and to prevent any disturbance of the peace of the consular post or impairment of its dignity.

4.  The consular premises, their furnishings, the property of the consular post and its means of transport shall be immune from any form of requisition for purposes of national defence or public utility. If expropriation is necessary for such purposes, all possible steps shall be taken to avoid impeding the performance of consular functions, and prompt, adequate and effective compensation shall be paid to the sending State.

\* \* \*

*Article 33*

*Inviolability of the consular archives and documents*

The consular archives and documents shall be inviolable at all times and wherever they may be.


\* \* \*

*Article 35*

*Freedom of communication*

1.   The receiving State shall permit and protect freedom of communication on the part of the consular post for all official purposes. In communicating with the Government, the diplomatic missions and other consular posts, wherever situated, of the sending State, the consular post may employ all appropriate means, including diplomatic or consular couriers, diplomatic or consular bags and messages in code or cipher. However, the consular post may install and use a wireless transmitter only with the consent of the receiving State.

2.   The official correspondence of the consular post shall be inviolable. Official correspondence means all correspondence relating to the consular post and its functions.

3.   The consular bag shall be neither opened nor detained. Nevertheless, if the competent authorities of the receiving State have serious reason to believe that the bag contains something other than the correspondence, documents or articles referred to in paragraph 4 of this article, they may request that the bag be opened in their presence by an authorized representative of the sending State. If this request is refused by the authorities of the sending State, the bag shall be returned to its place of origin.

4.   The packages constituting the consular bag shall bear visible external marks of their character and may contain only official correspondence and documents or articles intended exclusively for official use.

5.   The consular courier shall be provided with an official document indicating his status and the number of packages constituting the consular bag. Except with the consent of the receiving State he shall be neither a national of the receiving State, nor, unless he is a national of the sending State, a permanent resident of the receiving State. In the performance of his functions he shall be protected by the receiving State. He shall enjoy personal inviolability and shall not be liable to any form of arrest or detention.

6.   The sending State, its diplomatic missions and its consular posts may designate consular couriers ad hoc. In such cases the provisions of paragraph 5 of this article shall also apply except that the immunities therein mentioned shall cease to apply when such a courier has delivered to the consignee the consular bag in his charge.

A-16

7.  A consular bag may be entrusted to the captain of a ship or of a commercial aircraft scheduled to land at an authorized port of entry. He shall be provided with an official document indicating the number of packages constituting the bag, but he shall not be considered to be a consular courier. By arrangement with the appropriate local authorities, the consular post may send one of its members to take possession of the bag directly and freely from the captain of the ship or of the aircraft.

\*   \*   \*

*Article 41*

*Personal inviolability of consular officers*

1. Consular officers shall not be liable to arrest or detention pending trial, except in the case of a grave crime and pursuant to a decision by the competent judicial authority.

2. Except in the case specified in paragraph 1 of this article, consular officers shall not be committed to prison or be liable to any other form of restriction on their personal freedom save in execution of a judicial decision of final effect.

3. If criminal proceedings are instituted against a consular officer, he must appear before the competent authorities. Nevertheless, the proceedings shall be conducted with the respect due to him by reason of his official position and, except in the case specified in paragraph 1 of this article, in a manner which will hamper the exercise of consular functions as little as possible. When, in the circumstances mentioned in paragraph 1 of this article, it has become necessary to detain a consular officer, the proceedings against him shall be instituted with the minimum of delay.


\*   \*   \*